# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA

ADAM HARTMAN,                )
                                     )
        Plaintiff,           )
                                     )
       v.                  )     CAUSE NO.: 3:10-CV-528-TLS
                                     )
EBSCO INDUSTRIES, INC.,      )
KK WARRANTY, INC., F/K/A,    )
MODERN MUZZLELOADING, INC.,  )
d/b/a KNIGHT RIFLES, and PI, INC.,  )
                                     )
        Defendants.       )

## OPINION AND ORDER

This matter is before the Court on two summary judgment motions. Defendant Ebsco Industries, Inc., filed a Motion for Summary Judgment [ECF No. 49] on December 21, 2012. Defendant KR Warranty, Inc., formerly known as Modern Muzzleloading, Inc., doing business as Knight Rifles, filed a Motion to Exclude Portions of the Testimony of Steven Howard and for Summary Judgment [ECF No. 50], also on December 21. Because the Court finds that no genuine issues of material fact remain, and that judgment in favor of the moving parties is appropriate, the Court will grant the motions for summary judgment.

## BACKGROUND

Defendant KR Warranty manufactures muzzleloading firearms. In 1998, Defendant Ebsco Industries acquired the stock of Modern Muzzleloading, Inc., the former name of KR Warranty. The Plaintiff, Adam Hartman, is an Indiana resident.

In 1994, Defendant KR Warranty began manufacturing the LK-93 Wolverine muzzleloading rifle that the Plaintiff used at the time of his injury. Also in 1994, the Plaintiff's

father gave the Plaintiff an LK-93 Wolverine muzzleloader. The Plaintiff was ten years old when he received the rifle. The Wolverine rifle used a number 11 percussion cap ignition system to ignite a black powder charge. At the time the Plaintiff received the Wolverine rifle, synthetic Pyrodex pellets were not in use as an alternative to black power. The Plaintiff used his Wolverine rifle for hunting for many years, and he estimated that he fired it between 500 and 600 times. At some point after Pyrodex pellets were introduced, the Plaintiff attempted to use Pyrodex pellets in his rifle, but was dissatisfied with the number 11 percussion cap's ability to reliably ignite the pellets.

In November 2008, when the Plaintiff was twenty-three years old, he purchased a telescopic lens and a Knight 209 Primer Extreme Conversion Kit (the 209 Conversion Kit) for his Wolverine rifle. The Plaintiff's purpose in purchasing the 209 Conversion Kit was to deliver a hotter spark to more reliably ignite Pyrodex pellets. On the evening of November 28, 2008, the Plaintiff installed the 209 Conversion Kit by unscrewing the old number 11 percussion breech plug and screwing in the new 209 Conversion Kit breech plug. He also installed a 209 Conversion Kit bolt and dual safety system. The process of installing the 209 Conversion Kit took no more than thirty minutes.[1] The Plaintiff also installed the telescopic lens.

On November 29, the Plaintiff and two friends went to a rural area to sight in the Wolverine rifle. The Plaintiff fired two shots without swabbing the bore of his rifle between shots. For the second shot, the Plaintiff used a patched round ball instead of a bullet. The Plaintiff put a primer cap on the nipple of the breech plug before he attempted to load a third

_____

1 The Plaintiff's expert estimated that the process of conversion would take from five to ten minutes to complete (1st Expert Report 8, ECF No. 52-8.) The Defendants indicate the process took the Plaintiff thirty minutes (Reply 12, ECF No. 60), but the Defendants do not designate any evidence in support of that statement.

shot. Then he loaded two Pyrodex pellets, manufactured by Hodgdon, into the muzzle of the rifle, followed by another patched round ball. As he was attempting to seat the patched round ball by using a ramrod, he cupped his hands over the end of the ramrod, and the rifle unexpectedly discharged, causing the bullet and ramrod to pass through the Plaintiff's left hand, right hand, and right forearm. (Compl. ¶ 10, ECF No. 1.)

The Plaintiff filed a Complaint for Damages [ECF No. 1] against Defendant Ebsco, Defendant KR Warranty,[2] and Defendant PI, Inc., in the Elkhart Circuit Court on November 24, 2010. On December 20, the Defendants removed the case to this Court. The Defendants filed an Answer [ECF No. 6] on December 21, pleading, *inter alia*, that the Plaintiff's claims were barred by the Indiana Statute of Repose. Accordingly, the Plaintiff filed an Amended Complaint [ECF No. 22] on March 4, 2011.

On December 21, 2012, at the conclusion of discovery, all three Defendants moved for summary judgment. Defendant PI, Inc., filed a Motion for Summary Judgment [ECF No. 48], arguing that it had no involvement with the manufacturing, sale, distribution, or design of any of the products involved in the lawsuit. The Plaintiff filed a Response [ECF No. 56], and Defendant PI, Inc., filed a Reply [ECF No. 59]. At the motions hearing held on June 17, 2013, the Plaintiff confirmed that he did not object to Defendant PI's Motion, and the Court granted Defendant PI's Motion for Summary Judgment in an Opinion and Order [ECF No. 71] dated June 20, 2013.

Defendant Ebsco, Inc., filed a Motion for Summary Judgment [ECF No. 49] on December 21, 2012, arguing that it also had no involvement in the manufacturing, design, or sale of the Wolverine rifle or the 209 Conversion Kit. Defendant Ebsco also adopted the grounds for relief articulated by Defendant KR Warranty in its Motion [ECF No. 50]. The Plaintiff filed a

---

2 The Plaintiff sued Defendant KR Warranty as "Modern Muzzleloading, Inc., d/b/a/ Knight Rifles."

Response [ECF No. 57] opposing Defendant Ebsco's Motion on February 15, 2013, and Defendant Ebsco filed a Reply [ECF No. 74] on July 1.

Defendant KR Warranty filed a Motion to Exclude Portions of the Testimony of Steven Howard and for Summary Judgment [ECF No. 50] on December 21, 2012, along with a Brief in Support [ECF No. 51] and multiple Evidentiary Submissions [ECF No. 52]. The Plaintiff filed a Response [ECF No. 55] on February 15, 2013, including some attachments, and filed a Supplement [ECF No. 58], including more attachments, on February 19. Defendant KR Warranty filed a Reply [ECF No. 60] on March 15. Also on March 15, the Defendants filed a Request for Oral Argument [ECF No. 61] on Defendant KR Warranty's Motion. After a telephonic conference, the Court granted the Defendants' request and conducted a motions hearing on June 17. The Court heard arguments from the parties concerning the pending motions, inspected an exemplar Wolverine rifle and its constituent parts, and took the matters under advisement. Finally, Defendant KR Warranty filed an Additional Evidentiary Supplement [ECF No. 70] on June 19.

The matters contained in Defendant Ebsco's Motion for Summary Judgment and Defendant KR Warranty's Motion to Exclude Portions of the Testimony of Steven Howard and for Summary Judgment are fully briefed and ripe for this Court's ruling.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if the facts supported by materials in the record show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56. The motion should be granted so long as no

rational fact finder could return a verdict in favor of the party opposing the motion. *Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A court's role is not to evaluate the weight of the

evidence, to judge the credibility of witnesses, or to determine the truth of the matter, but instead

to determine whether there is a genuine issue of triable fact. *Anderson,* 477 U.S. at 249–50; *Doe*

*v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 443 (7th Cir. 1994). The party seeking summary

judgment bears the initial burden of proving there is no genuine issue of material fact. *Celotex*

*Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see also* N.D. Ind. L.R. 56-1(a) (stating that the

movant must provide a "Statement of Material Facts" that identifies the facts that the moving

party contends are not genuinely disputed). In response, the nonmoving party cannot rest on bare

pleadings alone but must use the evidentiary tools listed in Rule 56 to designate specific material

facts showing that there is a genuine issue for trial. *Celotex*, 477 U.S. at 324; *Insolia v. Philip*

*Morris Inc*., 216 F.3d 596, 598 (7th Cir. 2000); N.D. Ind. L.R. 56-1(b) (directing that a response

in opposition to a motion for summary judgment must include "a section labeled 'Statement of

Genuine Disputes' that identifies the material facts that the party contends are genuinely disputed

so as to make a trial necessary"). According to Federal Rule of Civil Procedure 56:

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).

Although a bare contention that an issue of fact exists is insufficient to create a factual dispute,

the court must construe all facts in a light most favorable to the nonmoving party, view all reasonable inferences in that party's favor, *see Bellaver v. Quanex Corp.*, 200 F.3d 485, 491–92 (7th Cir. 2000), and avoid "the temptation to decide which party's version of the facts is more likely true," *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003) (noting the often stated proposition that "summary judgment cannot be used to resolve swearing contests between litigants"). A material fact must be outcome determinative under the governing law. *Insolia*, 216 F.3d at 598–99. "Irrelevant or unnecessary facts do not deter summary judgment, even when in dispute." *Harney v. Speedway SuperAmerica, LLC,* 526 F.3d 1099, 1104 (7th Cir. 2008). Summary judgment is the "put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of the events." *Hammel v. Eau Galle Cheese Factory*, 407 F.3d 852, 859 (7th Cir. 2005) (quotation marks omitted).

## ANALYSIS

The parties' arguments center around the question of whether Indiana's ten-year statute of repose for products liability lawsuits bars the Plaintiff's claims. The Defendants also argue that the Plaintiff's expert, Steven Howard, has produced no testimony admissible under *Daubert*, and that the Plaintiff has produced no admissible evidence to show that a latent ember caused his injury. The Court will address all issues raised by the parties under the rubric of the Indiana statute of repose.

## A.     The Indiana Statute of Repose

The Indiana statute of repose "governs all actions that are . . . brought by a user or

6

consumer . . . against a manufacturer or seller . . . and . . . for physical harm caused by a product . . . regardless of the substantive legal theory or theories upon which the action is brought." Ind. Code § 34-20-1-1. The statute of repose bars a plaintiff's products liability claim where "the damages incurred by plaintiff occurred more than ten years after the product was first placed in commerce." *Dague v. Piper Aircraft Corp.*, 418 N.E.2d 207, 211 (Ind. 1981).[3] Failure to warn claims are among the types of claims barred by the statute of repose. *See Avery v. Mapco Gas Prods., Inc.*, 18 F.3d 448, 451 (7th Cir. 1994) (citing *Dague* for the proposition that "the Indiana Supreme Court has held that failure to warn claims merge with the underlying product liability claims").

However, courts have recognized two exceptions to the ten year statute of repose. First, "any reconstruction or reconditioning (as distinct from a mere repair-a familiar distinction in other areas of law . . .) which has the effect of lengthening the useful life of a product beyond what was contemplated when the product was first sold starts the statute of repose running anew." *Richardson v. Gallo Equip. Co.*, 990 F.2d 330, 331 (7th Cir. 1993) (citing, *inter alia*, *Denu v. W. Gear Corp.*, 581 F. Supp. 7 (S.D. Ind. 1983)). The rationale for the first exception is that "[o]therwise the statute would create an inefficient incentive to reconstruct or recondition old products rather than build new ones, in order to reduce expected liability costs; for under such a regime a product rebuilt after ten years would be immunized from liability." *Richardson*, 990 F.2d at 331. The second exception is that "merely by incorporating a defective component

---

3 The Indiana Supreme Court summarized its interpretation of the Statute of Repose as follows: "The obvious intent of the statute . . . is that the action must be brought within two years after it accrues, but in any event within ten years after the product is first delivered to the initial user or consumer, unless the action accrues more than eight but less than ten years after the product's introduction into the stream of commerce." *Dague*, 418 N.E.2d at 210.

into an old product the incorporator cannot obtain the protection from suit that the statute of repose gave the old product." *Id.* (citing, *inter alia*, *Black v. Henry Pratt Co.*, 778 F.2d 1278, 1282–83 (7th Cir. 1985)).

**B.      The 209 Conversion Kit Did Not Extend the Useful Life of the Plaintiff's Rifle**

The Court finds, first, that the Plaintiff has failed to show that his situation meets the first exception to the statute of repose. The Plaintiff argues that installing the 209 Conversion Kit radically altered the Wolverine rifle so as to reconstruct or recondition it to the point that it became "an entirely new rifle." (Resp. 17, ECF No. 55.) The Plaintiff urges that black powder muzzleloaders were nearly obsolete by the time he installed the 209 Conversion Kit, and that his installation of the 209 extended the useful life of the rifle because it transformed his antiquated, black powder muzzleloader into a modern rifle. The Plaintiff also argues, in the alternative, that even if the 209 Conversion Kit did not extend the useful life of his rifle, it did increase the reliability, accuracy, and muzzle velocity to such an extent as to meet the reconstruction or reconditioning required for the first exception to the statute of repose as articulated by the Seventh Circuit in *Richardson*.

The Court agrees with the Defendants that the Plaintiff's installation of the 209 Conversion Kit did not reconstruct or recondition his Wolverine rifle as outlined in *Richardson*. The Seventh Circuit has plainly stated that, to reset the statute of repose under the first exception, the restructuring or reconditioning would have to have "the effect of lengthening the useful life of a product beyond what was contemplated when the product was first sold." *Richardson*, 990 F.2d at 331. The Defendants have introduced evidence that the only measure of the Wolverine

8

rifle's useful life is its barrel. As the Defendants' expert stated in his second declaration: "The life expectancy of the Knight Rifle is determined by the useful life of the barrel and bore. The barrel is the one irreplaceable component of this gun and is the only thing that determines the useful life expectancy of this gun." (Meanley Decl., ECF No. 60 at 16.) While the Plaintiff criticizes the Defendants' expert for his non-scientific background and failure to perform tests, the Plaintiff presents no *Daubert* challenge to Meanley's opinions, and does not suggest that Meanley's experience manufacturing over four million rifle barrels is insufficient to support his opinions concerning the useful life of a muzzleloading rifle. Given the evidence from Meanley, any number of updates to the rifle could improve its performance without extending its useful life. *See Richardson*, 990 F.2d at 332 ("[M]erely adding a component, without extending the life of the original product . . . does not affect the statute of repose."). Thus, the Plaintiff's arguments about reliability, accuracy, and muzzle velocity are irrelevant to the issue of whether this lawsuit is barred by the Indiana statute of repose because, even if the Plaintiff could show that the Wolverine rifle is more reliable, more accurate, and has a higher muzzle velocity with the 209 Conversion Kit, none of those improvements would extend the useful life of the rifle.

As to the Plaintiff's argument that the number 11 percussion cap ignition system was essentially obsolete by 2008, the Defendants have introduced evidence that at least four states do not even allow installation of the 209 Conversion Kit in muzzleloaders today. Thus, in at least four states, the number 11 percussion cap system is still a viable alternative. Further, the Defendants effectively cross examined the Plaintiff's expert, Steven Howard, concerning his opinions. In his deposition, he admitted that his tests comparing the number 11 percussion cap

ignition system with the 209 breech plug did not test for accuracy,[4] and that the minor difference he noted in muzzle velocity could be attributed to a change in altitude or temperature. Further, the Defendants' expert stated that while the 209 breech plug was more reliable for igniting synthetic pellets (as it was designed to do), it was no more reliable in igniting black powder than the number 11 percussion cap system. (Meanley Decl. 4, ECF No. 52-2.) Thus, the Plaintiff's statement that installation of the 209 Conversion Kit "improved the performance and extended the useful life of the product" (Resp. 19, ECF No. 55) appears to be incorrect on both counts. The Plaintiff has produced no admissible evidence to show that the 209 Conversion Kit meaningfully improved the performance of the Wolverine rifle when using black powder, although it did improve the reliability of the rifle in igniting synthetic pellets. Furthermore, even if the Plaintiff had shown improved performance, that would not prove an increased useful life of the product because it would not increase the life of the barrel. The Plaintiff argued at oral argument that replacing the spring-loaded firing pin, and, more generally, the entire ignition system, both of which are involved in installing the 209 Conversion Kit, would extend the useful life of the rifle. But as the Defendants argue, it appears both of these would be mere upgrades, akin to replacing the spark plugs on an automobile in that they would improve performance but not extend the useful life of the product.

The Plaintiff also urges that the Defendants should be bound by statements in their rifle user manuals that the 209 Conversion Kit "puts more fire into the breech end ensuring spontaneous ignition, faster lock time, consistent velocity, and a hotter burn of the powder

---

4 Howard also noted that he personally sold a muzzleloader with the 209 Conversion Kit installed because he was dissatisfied with its accuracy.

charges for a cleaner breech area. This contributes to better accuracy."[5] As discussed above, these claims are not substantiated by the record, and even if all of these claims were substantiated, it would not show that the 209 Conversion Kit extended the useful life of the Wolverine rifle. The Plaintiff also points to a Cabela's advertisement concerning the 209 Conversion Kit, stating that it "[u]pgrades your Knight muzzleloader to accept 209 shotgun primers." (ECF No. 58-8 at 5.) This appears to be nothing more than a straightforward statement of the purpose of the 209 Conversion Kit, suggesting an upgrade but not an extension of the useful life of the product.

The Plaintiff's evidence fails to meet the first exception to the statute of repose for an additional reason. According to the Plaintiff, he performed the upgrade of his Wolverine rifle himself instead of sending it to the manufacturer for reconstruction. As the Defendants note in their Reply, "every case cited by the Plaintiff involves a product which had been reconditioned by a manufacturer and resold back into the stream of commerce." (Reply 12.) Thus, the cases on point suggest that the statute of repose is reset under the first exception only when the manufacturer, as opposed to the consumer, performs the reconstruction or reconditioning that lengthens the useful life of the product. *See Miller v. Honeywell Inc.*, No. IP98-1742-C-M/S, 2001 WL 395149, *6 (S.D. Ind. Mar. 7, 2001) (stating that the first exception to the statute of repose applies "if the *manufacturer* rebuilds the product, to the point of significantly extending the life of the product and rendering it in like-new condition") (emphasis added); *Denu v. W. Gear Corp.*, 581 F. Supp. 7, 8 (S.D. Ind. 1983) (stating the first exception to the statute of repose

---

5 This language appears in the Knight Rifles Born to Hunt Instructions and Safety Manual, 2007 and 2011 editions. (ECF No. 58-1 at 4; ECF No. 58-2 at 6.)

as follows: "the introduction into commerce of a reconditioned product *by a manufacturer* may give rise to expectations of safety which would support a products liability action") (emphasis added). The Plaintiff argues that by supplying replacement parts in the form of the 209 Conversion Kit, the Defendants should be liable just as though they had performed the upgrade to the Wolverine rifle themselves. But the Court finds the distinction between a manufacturer reconditioning a product and reselling it into the stream of commerce and a manufacturer selling replacement parts for a product to be a meaningful one. Absent any authority in support, the Court finds that the Plaintiff's upgrade of his Wolverine rifle by installing the 209 Conversion Kit did not trigger the first exception to the statute of repose because he has not alleged reconditioning by the manufacturer.

For all the reasons discussed, the Court finds that the Plaintiff has failed show that it is appropriate to reset the Indiana statute of repose under the first exception from *Richardson*.

## C.    The Plaintiff Has Failed to Show that the 209 Conversion Kit was Defective

The Court finds, second, that the Plaintiff has failed to show that the facts of his case would reset the Indiana statute of repose under the second exception noted in *Richardson*. Under that exception, the Plaintiff could reset the statute by showing that the 209 Conversion Kit was itself defective. *See Richardson*, 990 F.2d at 331. The Court notes that although the Plaintiff argued in his Response that the 209 Conversion Kit was defective, he did not argue defectiveness under the second exception to the statute of repose at oral argument, despite the Court's invitation for him to do so in a telephonic conference prior to oral argument. For obvious reasons, the Defendants also did not discuss the second exception to the statute of repose at oral

12

argument. Nevertheless, the Court will discuss whether the record supports resetting the Indiana statute of repose under the second exception.

Under Indiana law, "[e]xpert testimony is generally required to establish a design defect because the plaintiff must show not only that another design could have prevented the accident but also that the benefits of the alternative design outweighed its costs." *Rodefer v. Hill's Pet Nutrition, Inc.*, No. IP 01-123-C H/K, 2003 WL 23096486, at *9 (S.D. Ind. Nov. 7, 2003) (citing *Whitted v. Gen. Motors Corp.*, 58 F.3d 1200, 1206 (7th Cir. 1995), and *Pries v. Honda Motor Co.*, 31 F.3d 543, 545 (7th Cir. 1994)). *See also Hargis v. Wellspeak Enters., Inc.*, No. 1:08-cv-00339-RLY-TAB, 2012 WL 3144962, at *2 (S.D. Ind. Aug. 1, 2012) ("'Where the existence of a defect depends on matters beyond the common understanding of a lay juror, however, admissible expert testimony is required to sustain the plaintiff's burden of proof on the question.'" (quoting *Owens v. Ford Motor Co.*, 297 F. Supp. 2d 1099, 1103–04 (S.D. Ind. 2003)).

When "[f]aced with a proffer of expert scientific testimony . . . , the trial judge must determine at the outset, pursuant to Rule 104(a), whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue. This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592–93 (1993) (footnotes omitted). This analysis requires courts to consider whether a theory or technique can be or has been tested, whether it has been subjected to peer review and publication, the known or potential error rate, and whether it commands general acceptance in the scientific community. *Id.* at 593–94. *See Bradley v. Brown*, 42 F.3d 434, 437–38 (7th Cir.

1994) (discussing *Daubert*). District court judges have a "gatekeeping role" where expert testimony is concerned, *Daubert*, 509 U.S. at 597, and "have significant responsibility in determining whether expert testimony is relevant and helpful," *Bradley*, 42 F.3d at 437.

The Seventh Circuit has set forth a three-step analysis for determining whether expert testimony is admissible under *Daubert*. A district court "must ascertain whether the expert is qualified, whether his or her methodology is scientifically reliable, and whether the testimony will 'assist the trier of fact to understand the evidence or to determine a fact in issue.'" *Bielskis v. Louisville Ladder, Inc.*, 663 F.3d 887, 893 (7th Cir. 2011) (quoting Fed. R. Evid. 702). In analyzing the factors discussed in *Daubert*, a district court's inquiry is "flexible." *Bielskis*, 663 F.3d at 894 (quoting *Daubert*, 509 U.S. at 594).

In his Response, the Plaintiff argues that the 209 Conversion Kit was itself defective in two ways. First, he argues, the 209 Conversion Kit was defective because it did not include a jag designed to extinguish latent embers on the recessed face of the 209 breech plug. Second, he contends that the 209 Conversion Kit was defective because it did not include a warning to swab the barrel between shots to extinguish latent embers. The Court will address each of these theories of defectiveness and whether the Plaintiff can produce admissible evidence to support them under *Daubert*.

1.      Steven Howard's Replacement Jag Testimony is Inadmissible Under *Daubert*

Steven Howard, an experienced firearms expert and gunsmith, submitted a First Expert Report [ECF No. 52-8] in this matter in which he concluded that the cause of the Plaintiff's accident was a latent spark or ember. Howard stated that a piece of the Pyrodex pellet used to

fire the second shot must have remained burning inside the barrel of the Plaintiff's Wolverine rifle, and must have ignited the charge that the Plaintiff loaded into the barrel before he attempted to load the patched round ball for a third shot. The Court will address this finding in more detail in the next section.

With the Court's permission, the Plaintiff introduced a Second Expert Report [ECF No. 52-9] from Steven Howard in this matter. In his second Report, Howard opined that the 209 breech plug is defective because the cleaning jag supplied by Defendant KR Warranty is not designed to match the recess in the bolt face. A jag is a tool that screws onto the end of the ramrod, and is used to sweep the inside of the barrel after firing a muzzleloader. Howard believes that, because the jag supplied by the Defendants does not perfectly match the recessed portion of the 209 breech plug, latent embers are likely to remain after discharge of the rifle and cause accidents, such as the one involving the Plaintiff. Notably, Howard does not believe that the recessed face of the 209 breech plug is itself a defective design. Indeed, he states that it is "a reasonable and necessary part of [the] design for the performance of [the] product." (2d Expert Report 4, ECF No. 52-9.) He does believe that absent a differently designed jag, however, the 209 Conversion Kit as a whole is defective because it increases the likelihood of latent embers causing injury. To solve this problem, he submitted his own design for a new jag with a convex tip that would fit into the recessed face of the 209 breech plug. He posits that such a jag, if marketed along with the 209 Conversion Kit, would adequately clear any latent embers away from the face of the breech plug, preventing accidents and solving the defect in the 209 Conversion Kit as a whole. Howard included a sketch of his proposed jag in his second Report, and he also made a working model of the new jag, though he has never actually used it in a

firearm.

The Defendants argue that Howard's alternate jag design is inadmissible under *Daubert*. They note that Howard agreed at his deposition that his proposed jag was "neither finished nor tested, nor peer reviewed, nor accepted in the industry." (Mem. in Supp. 15, ECF No. 51.) They also note his testimony at his deposition about whether he had thought of any additional problems that his new jag might cause: "I have sat down and really, really thought about that. And I have not been able to come up with any problems it would create." (*Id.*) Moreover, the Defendants argue that Howard's jag design is inadmissible under *Daubert* because it is divorced from the facts of the Plaintiff's case. Here, it is undisputed that the Plaintiff did not swab the barrel between any of his shots on the day of his accident. Thus, the Defendants argue, Howard's testimony about swabbing the barrel with a jag to prevent latent embers would not assist the trier of fact in determining any fact in issue and should be excluded under *Daubert*.

The Court agrees with the Defendants that Howard's testimony as to his alternate jag design is not admissible under *Daubert*. The Court notes that the Defendants have not challenged Howard's qualifications to give expert opinions in the area of firearms design, and it appears his extensive background as a gunsmith and firearms expert would qualify him. Next, the Court must address whether "his methodology is scientifically reliable, and whether the testimony will assist the trier of fact to understand the evidence or to determine a fact in issue." *Bielskis*, 663 F.3d at 893 (quotation marks omitted). The Court finds that Howard's jag design fails both of these tests. Howard's methodology is not scientifically reliable. His design has not been tested, or subjected to peer review or publication. The potential error rate is unknown as his jag model has never been used in a working firearm. His design has not been accepted in the relevant

scientific community. He submits only that he is convinced his theory is sound and that it would

not cause additional problems to force a jag into the recessed face of the breech plug. This

untested theory does not meet the standards required by *Daubert*. Further, the Court agrees with

the Defendants that testimony about an alternate jag design is irrelevant in this case as it is

undisputed that the Plaintiff did not swab the barrel of his rifle using a jag on the date of his

accident. Thus, even if an alternate jag would extinguish latent embers in the recessed face of the

209 breech plug, such a jag would not have helped the Plaintiff. *See, e.g., Deimer v. Cincinnati*

*Sub-Zero Prods., Inc.*, 58 F.3d 341, 345 (7th Cir. 1995) (upholding district court's decision to

exclude expert testimony under *Daubert* where the testimony "would be of no help to the trier of

fact in evaluating the evidence"). Because his methodology is not reliable, and because his

theory will not help the trier of fact determine any fact at issue in this case, the Court will grant

the Defendants' motion to exclude this design theory under *Daubert*. Accordingly, the Plaintiff

cannot proceed with this theory of defectiveness to reset the statute of repose under the second

exception.[6]

---

6 Howard submitted an additional theory of defectiveness in his Second Expert Report, opining that the
solvent recommended by Defendant KR Warranty to use in swabbing the barrel is ineffective because
using too much of it can contaminate synthetic pellets and cause them not to be fully consumed in a
discharge, resulting in possible latent embers. To solve this problem, Howard suggests the Defendants
furnish an alcohol-based solvent to swab the barrels of their firearms. Even the Plaintiff has not suggested
that this testimony by Howard is admissible in this matter. The Defendants argue that the solvent tests
conducted by Howard do not accurately measure how a solvent will respond under actual firing
conditions. The Defendants also note that no manufacturer of muzzleloaders recommends an alcohol-
based solution. Finally, the Defendants point out that this testimony is also divorced from the facts before
the Court because it is undisputed that the Plaintiff did not use any kind of solvent to swab the bore of his
Wolverine rifle on the day of his accident. The Court agrees that, for many of the reasons discussed
above, Howard's testimony about an alternate solvent is inadmissible under *Daubert*, and does not
present a basis for the Plaintiff to reset the Indiana statute of repose under the second exception listed in
*Richardson*.

2.      The Plaintiff Has Not Shown Defectiveness Because of a Failure to Warn

The Plaintiff's second theory of defectiveness is that the 209 Conversion Kit was defective in that it did not include an express warning to swab the barrel between shots to prevent the possibility of injury from latent embers. The Plaintiff points out that the 2007 and 2011 editions of the Defendants' Knight Rifles Born to Hunt Instructions and Safety Manual both contain explicit warnings to swab between shots because of the risk of latent embers.[7] Further, the Defendants released the 2007 Manual before introducing into commerce the 209 Conversion Kit purchased by the Plaintiff in 2008. Therefore, the Plaintiff argues, the 209 Conversion Kit he purchased was defective because of a failure to warn about the possibility of latent embers, and that defect resets the Indiana statute of repose. The Defendants respond that, in the 1994 Manual the Plaintiff received with his Wolverine rifle when he was ten years old, Defendant KR Warranty did instruct the Plaintiff to swab his barrel between shots when sighting in the rifle. The Defendants also argue that they had no duty to warn about every possible danger when the Plaintiff's expert has testified that the 209 Conversion Kit did not cause the spark that he alleges set off the charge resulting in the Plaintiff's injury. Where their product is not the cause of the Plaintiff's injury, the Defendants argue, a failure to warn does not reset the Indiana statute of repose. The Defendants raise additional arguments relating to the warning provided by Hodgdon, the manufacturer of the Pyrodex pellets at issue in this case.

While "[t]he adequacy of warnings is classically a question of fact reserved to the trier of fact and, therefore, usually an inappropriate matter for summary judgment," *Jarrell v. Monsanto*

---

[7] The 2007 Manual states: "**WARNING Failure to swab the barrel as instructed can leave hot embers in the barrel, which can result in accidental discharge during loading.**" (ECF No. 58-1 at 6.) The 2011 Manual states: "**WARNING Failure to swab the bore as instructed before reloading may leave hot residue in the bore which could result in an accidental discharge during loading.**" (ECF No. 58-2 at 13.)

*Co.*, 528 N.E.2d 1158, 1162 (Ind. Ct. App. 1988), "[t]he determination of whether a duty to warn exists is generally a question of law for the court to decide rather than one of fact," *Natural Gas Odorizing, Inc. v. Downs*, 685 N.E.2d 155, 161 (Ind. Ct. App. 1997).

At oral argument, counsel for the Plaintiff stated that "this is at its heart a warnings case." The Plaintiff believes the Defendants' failure to include an explicit warning about the danger of latent embers should go to the jury because a reasonable jury could conclude the Defendants, who by 2007 warned about the dangers of latent embers, are liable. But the Plaintiff's case cannot go forward if it is barred by the statute of repose. The only question remaining is whether the Defendants' failure to include with the 209 Conversion Kit an explicit warning to swab the barrel between shots because of the danger of latent embers made the 209 Conversion Kit defective and therefore reset the statute of repose. The Court finds that it did not.

As the Defendants note, the Plaintiff's own expert admitted that the recessed bolt face of the 209 breech plug was not a design flaw. He described that recess feature as "a reasonable and necessary part of [the] design for the performance of [the] product." (2d Expert Report 4, ECF No. 52-9.) Further, the Plaintiff's expert agreed that the 209 Conversion Kit did not cause the spark that, in the expert's opinion, caused the Plaintiff's injury. At his deposition, he testified that it was the Pyrodex pellet from the previous shot, still smoldering in the barrel, that caused the spark leading to the Plaintiff's injury. (Howard Dep. 87, ECF No. 52-3 at 6.) On this basis, the Defendants argue that summary judgment is appropriate. As the Seventh Circuit has stated, where replacement parts "were not related to the cause of the . . . accident," sale of replacement parts will not reset the statute of repose. *Black*, 778 F.2d at 1283–84. Because the cause of the accident (according to the Plaintiff) was a smoldering piece of a Pyrodex pellet manufactured by

Hodgdon, the Defendants argue they cannot be held liable for failing to warn about the danger of an accident caused by another manufacturer's product.[8]

The Court agrees that, based on the evidence in the record, the Plaintiff has failed to show that the Defendants had a duty to warn about every possible pellet manufacturer's product. The Defendants introduced evidence that Hodgdon does instruct users of its Pyrodex pellets not to use patched round balls with its pellets because of a danger that an imperfect seal around the patched round ball can lead to accidental discharge. (Hodgden Misuse Warning, ECF No. 52-12.)[9] The Defendants also introduced evidence that at least one pellet manufacturer instructs users that swabbing between shots is unnecessary. (Meanley Decl., ECF No. 60 at 17.) In light of apparently conflicting instructions from pellet manufacturers, the Court finds that the Plaintiff has failed to show that the Defendant had a duty to warn about every possible propellant that could be used in conjunction with the 209 Conversion Kit.

The Court's finding depends on Howard's uncontested admission that the 209 breech plug did not cause the spark that led to the Plaintiff's injury. In response, while the Plaintiff did not explicitly address Howard's statement, it appears the Plaintiff argues that the 209 breech plug was at least partially responsible for his injury because its recessed bolt face made it more likely that a latent ember would catch in the barrel. On this point, however, the Court must return to its gatekeeping role under *Daubert*. Although Howard stated that in his opinion the 209 breech plug's design increases the likelihood of latent embers, this opinion appears to be nothing more

---

8 The Court notes that the Plaintiff has not responded to the Defendants' argument about Howard's admission that the 209 breech plug did not cause the spark. Nor has the Plaintiff introduced additional pages from Howard's deposition indicating any redirect examination of Howard on this point.
9 The Plaintiff has not sued Hodgden in this matter.

than an untested theory. The Defendants note that Howard did not find affirmative evidence of a latent ember in this case. Although Howard did find evidence tending to exclude the possibility that the Plaintiff's mistake in putting the primer cap on the nipple of the breech plug before attempting to load the third shot caused the injury, the Defendants insist that a latent ember is still only one of three possible causes for the Plaintiff's injury. According to Meanley, either increased heat from quick air compression or a static spark from the fiberglass ramrod could have ignited the black powder portion of the Pyrodex pellets in the barrel, and could have caused the Plaintiff's injury. (Meanley Decl. 3–4, ECF No. 52-2.) Howard did not perform any kind of testing to prove that the 209 breech plug is more likely to retain latent embers. He introduced no evidence that his theory has been subjected to peer review or publication, or has been generally accepted among other firearms experts. He did not discuss the known or potential error rate of his theory relating to the 209 breech plug. He stated, instead, that "[t]he problem of latent sparks in this Danger zone is easily foreseeable especially during the design process and this problem should have been addressed when the [209 Conversion Kit] was in the developmental stage." (2d Expert Report 5.) The Court agrees with the Defendants that this is an insufficient showing of defectiveness and does not reset the Indiana statue of repose. Howard is saying, in essence, that the recessed face of the 209 breech plug is obviously more likely to retain latent embers than previous breech plugs.[10] It is true that "[e]xpert testimony is not always required to establish an

---

10 At oral argument, counsel for the Plaintiff argued similarly: "[T]he design of the face of the new breech plug for the 209 primer system is more likely to catch and hold residual embers than the totally convex shape of the old number 11 percussion cap system. That recessed area is simply not in the old number 11 percussion cap system. It doesn't take a lot of analysis. It doesn't take—I want to say scientific testing. Any person with any—I don't want to say any person—but a person with a fairly substantial knowledge regarding muzzleloader rifles is going to be able to see very easily that recessed area, that

element of a products liability action if there is sufficient circumstantial evidence within a lay person's understanding that would constitute a basis for a legal inference and not mere speculation." *Owens*, 297 F. Supp. 2d at 1103 (quotation marks omitted). However, "[w]here the existence of a defect depends on matters beyond the common understanding of a lay juror . . . , admissible expert testimony is required." *Id.* at 1103–04. The Court finds that the Plaintiff's theory of defectiveness in the 209 breech plug is beyond the common understanding of a lay juror, and expert testimony is therefore required. But as discussed above, the Court finds that Howard's assertion that the 209 breech plug is more likely to retain a latent ember is mere speculation absent some sort of testing to establish his opinion.[11]

The Plaintiff insists that, because the Defendants warned about the danger of latent embers in 2007, the 209 Conversion Kit was defective when sold without a similar warning in 2008. But the Court finds the complete warnings issued by the Defendants by 2011 to be instructive. Although the 2011 warning includes an explicit reference to swabbing the barrel to prevent injury from latent embers, the very next section instructs users to "[r]ead and follow all instructions and warnings provided by the manufacturer of the propellant you choose." (ECF No. 58-2 at 13.) Manufacturers of different propellants give different instructions regarding the dangers of latent embers. While the Defendants recognized that latent embers were a possible danger, they also recognized that users of their muzzleloaders were responsible for properly using each propellant. The Plaintiff has produced no admissible evidence suggesting that the 209

cylinder-looking area is going to hold a residual ember more likely to hold a residual ember that's in proximity to the propellant that's soon going to be introduced than the old model."
11 Moreover, in addition to preclusion of the Plaintiff's claim under the Indiana statute of repose, it appears summary judgment is also appropriate on behalf of the Defendants because the Plaintiff has not produced expert testimony to establish causation, a necessary element of the Plaintiff's claim.

Conversion Kit was itself defective or dangerous apart from the propellants used in conjunction with it.

Because the Plaintiff has failed to introduce admissible evidence that the 209 breech plug was itself defective, and in light of Howard's unrebutted statement that the 209 breech plug did not cause the spark that injured the Plaintiff, the Plaintiff has failed to show any defectiveness in the 209 Conversion Kit meriting a warning. Accordingly, the Plaintiff has failed to show that the Defendants' introduction of the 209 Conversion Kit without a warning relating to latent embers made it defective so as to reset the Indiana statute of repose under the second exception. *See Black*, 778 F.2d at 1283–84.[12]

### D.       Defendant Ebsco's Motion for Summary Judgment

In its Motion for Summary Judgment, Defendant Ebsco states that it "did not manufacture, design or sell the rifle or 209 conversion kit made the subject of the plaintiff's complaint" because Defendant Ebsco acquired the stock of Modern Muzzleloading, Inc. (the former name of Defendant KR Warranty) in 1998. (Mot. for Summ. J. 1, ECF No. 49.) Defendant KR Warranty manufactured the Wolverine rifle at issue in 1994. Further, Defendant

---

12 The Defendants also argue that the 1994 Wolverine rifle manual did instruct users to swab the barrel between shots when sighting in. The Plaintiff responds that this instruction was stated as a mere recommendation, and included no warning about the possible consequences of failing to swab between shots. Because the Court finds that the Plaintiff has failed to show any duty to warn about the 209 breech plug, the Court finds these arguments about the 1994 instruction to be moot. Moreover, the Defendants raise at least five other arguments relating to the Plaintiff's alleged misuse of the Wolverine rifle and Pyrodex pellets: 1) the Plaintiff used a patched round ball with a Pyrodex pellet; 2) the Plaintiff put his hands over the ramrod; 3) the Plaintiff pounded on the ramrod while attempting to seat the patched round ball; 4) the Plaintiff put the primer on the nipple of the breech plug before attempting to load the third shot; and 5) the Plaintiff stated he was not sure if he correctly oriented the Pyrodex pellets when loading the third shot. Except insofar as these arguments touch on the Indiana statute of repose, the Court finds that they are also moot.

Ebsco states that after 1998 it "remained an independently functioning corporation having its own officers and employees" and did not design, manufacture or sell the 209 Conversion Kit. (*Id.* 1–2.) Defendant Ebsco attached an Affidavit and Asset Purchase and Sale Agreement in support of its Motion. The Plaintiff responded that the documentation provided by Defendant Ebsco suggests "at least some affiliation with the manufacturer of Knight muzzleloader firearms and accessories from at least 2002 through at least 2011." (Response 2, ECF No. 57.) Because the Plaintiff purchased the 209 Conversion Kit in 2008, he argues summary judgment in favor of Defendant Ebsco is inappropriate. In reply, Defendant Ebsco urges that, generally, "a corporation will not be held liable for the acts of other corporations, including its subsidiaries." *Greater Hammond Cmty. Servs., Inc. v. Mutka*, 735 N.E.2d 780, 784 (Ind. 2000). To maintain an action against a parent corporation for the acts of its subsidiary, a plaintiff "must show that one corporation dominated another to the extent that the subordinate was the mere instrumentality of the dominant corporation." *Id.*; *see also IDS Life Ins. Co. v. SunAmerica Life Ins. Co.*, 136 F.3d 537, 540 (7th Cir. 1998) (discussing Illinois law, and stating that "[p]arents of wholly owned subsidiaries necessarily control, direct, and supervise the subsidiaries to some extent, but unless there is a basis for piercing the corporate veil and thus attributing the subsidiaries' torts to the parent, the parent is not liable for those torts"). The Court granted the Plaintiff's request to submit a sur-reply on this point, but the Plaintiff did not do so.

The Court finds that summary judgment is appropriate on behalf of Defendant Ebsco because it is uncontested that Defendant Ebsco had no relationship with Defendant KR Warranty in 1994 when it manufactured the Plaintiff's Wolverine rifle, and because the Plaintiff has offered no evidence to rebut the presumption that Defendant Ebsco is not responsible for the acts

24

of Defendant KR Warranty after 1998. The Plaintiff merely suggests that some relationship existed between Defendant Ebsco and Defendant KR Warranty in 2008 when he purchased the 209 Conversion Kit. This is insufficient to meet the Plaintiff's burden under Indiana law. *See Greater Hammond*, 735 N.E.2d at 784. Because it appears Defendant Ebsco had no part in designing, manufacturing, or selling the Wolverine rifle or the 209 Conversion Kit, the Court will grant summary judgment in favor of Defendant Ebsco on this additional basis.

## CONCLUSION

For the reasons discussed, the Court now GRANTS Defendant Ebsco's Motion for Summary Judgment [ECF No. 49]. Further, the Court GRANTS Defendant KR Warranty's Motion to Exclude Portions of the Testimony of Steven Howard and for Summary Judgment [ECF No. 50]. The Court DIRECTS the Clerk to enter judgment in favor of Defendants Ebsco and KR Warranty and against the Plaintiff, Adam Hartman.

SO ORDERED on September 30, 2013.

 s/ Theresa L. Springmann
THERESA L. SPRINGMANN
UNITED STATES DISTRICT COURT
FORT WAYNE DIVISION